UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| KEVIN MOODY and VERONICA MOODY, | ) | |
| individually and as parents and next friend of | ) | |
| TYLER MOODY, deceased, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 03-CV-0784-CVE-PJC |
| | ) | |
| FORD MOTOR COMPANY, | ) | |
| a Delaware Corporation, | ) | |
| | ) | |
| Defendant. | ) | |

**OPINION AND ORDER**

Now before the Court are Defendant Ford Motor Company's Renewed Motion for Judgment as a Matter of Law, and Brief in Support (Dkt. # 289) and Defendant Ford Motor Company's Motion for New Trial, and Brief in Support (Dkt. # 290).

**I.**

Before discussing the legal issues raised in Ford Motor Company's ("Ford") motions, the Court will offer a brief overview of the case. This case arose out of an automobile accident that occurred in Tulsa, Oklahoma on January 16, 2003. Tyler Moody ("Moody") was driving home with his friend, Brett Hickman ("Hickman"), in a two-door 1995 Ford Explorer Sport ("Explorer") that belonged to Moody's aunt. Moody was driving south on Delaware Avenue and he approached a curve in the road as Delaware Avenue turned into 121st Street. At trial, the facts concerning the accident were heavily contested but, according to plaintiffs' accident reconstruction expert, George

Hall, P.E., Moody was driving about 67 miles per hour ("mph") before he entered the curve.[1]  At some point before or in the curve, Moody approached a slower moving vehicle in front of him.

Moody attempted to pass the vehicle by moving from the right-hand lane to the left-hand lane.  When Moody was returning to the right-hand lane, he started to lose control of the vehicle and eventually slid off the road to the right.  In an attempt to regain control of the vehicle, he tried to turn left but he over-corrected.  He lost control of the vehicle and it began to roll.  After at least one and a half rolls,[2] the vehicle settled on its roof.  Hickman was able to unhook his seat belt and get out of the vehicle.  However, Moody was suspended upside-down and could not unhook his seat belt.  The driver's side of the roof partially crushed during the accident and, according to plaintiffs, pinned Moody in the vehicle in a position that prevented him from breathing.[3]  As a result of the accident, Moody died.  The autopsy report listed positional asphyxia as the cause of death.

Moody's parents filed a manufacturers' products liability claim against Ford, alleging that the roof of the Explorer was defectively designed and caused Moody's death.[4] Plaintiffs alleged that the roof was defective because it not designed with sufficient strength to withstand a foreseeable

---

[1]   The parties disputed the applicable speed limit in the curve.  Defendant presented evidence of a road sign that stated "30 mph" as vehicles approached the curve.  Plaintiffs argued that this sign was simply a recommendation, and the speed limit was actually 50 mph.

[2]   Plaintiffs presented expert testimony in an attempt to prove that the vehicle rolled over one and a half times.  Ford offered evidence that the Explorer rolled at least two and half times, if not more.

[3]   Ford argued that Moody could not unhook himself from the seat belt because he was knocked unconscious during the accident.  Plaintiffs claimed that Moody was conscious and was able to respond to questions by moving his fingers, even though he was unable to breathe.

[4]   Plaintiffs' original complaint contained claims for negligence and breach of warranty in addition to the manufacturers' products liability claim.  However, plaintiffs dismissed all claims except the products liability claim before trial.

rollover accident.  Ford raised several defenses, including: (1) the Explorer's roof was not defective because it complied with Federal Motor Vehicle Safety Standard ("FMVSS") 216; (2) the medical evidence did not prove that Moody was pinned in the vehicle, and roof crush was not the cause of his death; and (3) due to the severity of the accident, Ford could not have prevented Moody's death. The case proceeded to jury trial on November 8, 2006 and continued until November 20, 2006.  On November 20, 2006, the jury returned a verdict in favor of plaintiffs and awarded $15 million in actual damages.  The jury did not find by clear and convincing evidence that Ford acted with reckless disregard under Okla. Stat. tit. 23, § 9.1, the Oklahoma punitive damages statute.

Following the jury verdict, the Court entered judgment in favor of plaintiffs for $15 million in actual damages and $3,339,550.68 in prejudgment interest.  Within 10 days of entry of judgment, Ford timely filed motions pursuant to Fed. R. Civ. P. 50 and 59.  Pursuant to Rule 50, Ford argues that plaintiff failed to establish at least two essential elements of a products liability claim, and it is entitled to judgment as a matter of law.  In the alternative, Ford claims that it was prejudiced by plaintiffs' counsel's blatant disregard of the Court's in limine rulings and by his inflammatory conduct during trial, and the Court should order a new trial to ensure that the jury's verdict was not the product of passion or prejudice.

## II.

Ford's motion for judgment as a matter of law is reviewed under Fed. R. Civ. P. 50, which provides that "if during a jury trial a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue, the court may determine that issue against that party and may grant a motion for judgment as a matter of law against that party . . . ."  Fed. R. Civ. P. 50(a).  With regard to a renewed motion for judgment as a

matter of law, the Court may: allow the judgment to stand; order a new trial; or direct entry of judgment as a matter of law.   Fed. R. Civ. P. 50(b).   The Court must construe evidence and inferences in a light most favorable to the non-moving party.   Doan v. Seagate Technology, Inc., 82 F.3d 974, 976 (10th Cir. 1996).   The Court does not "'weigh the evidence, pass on the credibility of witnesses, or substitute [its] conclusions for that of the jury.   However, [it] must enter judgment as a matter of law in favor of the moving party if there is no legally sufficient evidentiary basis with respect to a claim . . . under the controlling law.'"   Yearous v. Niobrara County Mem'l Hospital, 128 F.3d 1351, 1353 (10th Cir. 1997) (quoting Mason v. Oklahoma Turnpike Authority, 115 F.3d 1442, 1450 (10th Cir. 1997)).

Ford's motion for new trial pursuant to Fed. R. Civ. P. 59(a) is governed by a different standard.   Pursuant to Rule 59, a new trial "may be granted to all or any of the parties and on all or part of the issues . . . in an action in which there has been a trial by jury, for any of the reasons for which new trial have heretofore been granted in actions at law in the courts of the United States . . . ."   Ford's basis for a new trial is the alleged "wire-to-wire misconduct" of plaintiffs' counsel, which allegedly prejudiced the jury against Ford and resulted in an unfair trial.   Dkt. # 290, at 1.   The Tenth Circuit permits courts to order a new trial when the moving party shows that it was prejudiced by attorney misconduct during trial.   Abuan v. Level 3 Communications, Inc., 353 F.3d 1158, 1175 (10th Cir. 2003); Mason, 115 F.3d at 1456; Ryder v. City of Topeka, 814 F.2d 1412, 1424 (10th Cir. 1987).   "The decision whether misconduct in a trial has been so egregious as to require retrial is largely left to the discretion of the trial court."   Angelo v. Armstrong World Indus., Inc., 11 F.3d 957, 962 (10th Cir. 1993) (quoting Polson v. Davis, 895 F.2d 705, 711 (10th Cir. 1990)).

### III.

Ford has moved for judgment as a matter of law on plaintiffs' claim for manufacturers' products liability.  Specifically, Ford claims that plaintiffs failed to prove two essential elements of their claim.  First, Ford argues that plaintiffs failed to introduce any evidence that roof crush caused Moody's death.  Second, it asserts that plaintiffs did not establish the existence of a defect in the Explorer, because the undisputed evidence proved that Ford complied with FMVSS 216.  Plaintiffs respond that they introduced sufficient evidence for the jury to find in their favor, and the Court does not have the authority to substitute its judgment for that of the jury.

### A.

Ford argues that plaintiffs' evidence was insufficient to prove that his injury was caused by a defect in the Explorer.  Ford's primary attack is against the testimony of plaintiffs' medical expert, Joseph Burton, M.D.  At trial, Dr. Burton testified that Moody died when his chin was compressed into his chest with such force that Moody's trachea was unable to open, which prevented Moody from breathing.  According to Ford, Dr. Burton lacked a reliable basis to make a medical conclusion as to the cause of Moody's death and he ignored contradictory evidence.  In addition, Ford argues that plaintiffs' other experts failed to show that reduced roof crush would have made any difference and, therefore, a defect in the roof could not have caused Moody's death.

The Oklahoma Supreme Court adopted a cause of action for manufacturers' products liability in <u>Kirkland v. General Motors Corp.</u>, 521 P.2d 1353, 1363 (Okla. 1974).  "The purpose behind manufacturers' products liability is to protect the ultimate consumer from the burden of loss caused by a defective product . . . ."  <u>Tansy v. Dacomed Corp.</u>, 890 P.2d 881, 884 (Okla. 1994).  In order to prevail on a products liability claim, a plaintiff must prove three elements:

5

1) the product was the cause of the injury;

2) the defect existed in the product at the time the product left the manufacturer's possession and control; [and]

3) the defect made the product unreasonably dangerous to the plaintiff or to the plaintiff's property.

Clark v. Mazda Motor Corp., 68 P.3d 207, 209 (Okla. 2003).  The plaintiff has the burden to prove that his injury was caused by a defect "'built in' and existing at the time of the injury," not simply the defendant's negligence.  Prince v. B.F. Ascher Co., Inc., 90 P.3d 1020, 1026 (Okla. Civ. App. 2004).

In this case, Dr. Burton testified that Moody died from positional asphyxia because, when Moody was pinned in the Explorer, his trachea bent to the point that air could no longer reach his lungs.  Ford claims that this testimony was "unsupported speculation," because Dr. Burton relied on selective eyewitness testimony and ignored testimony that did not support his conclusions.  Ford also asserts that Dr. Burton failed to apply reliable scientific principles to rule out alternate causes of Moody's death.  Ford cites the autopsy report showing that Moody's trachea appeared normal, and that Moody did not suffer any neck injuries in the accident.  Plaintiffs characterize this argument as a belated Daubert challenge to Dr. Burton's testimony that should have been raised at trial. Plaintiffs cite to the testimony of Hickman, Tommy Brantley, Timothy Halowell and James Watson, all of whom testified that Moody was pinned in the Explorer with his chin compressed to his chest.[5]

---

[5]    Ford relies on the testimony of Joe Carollo, a firefighter and paramedic on the scene of the accident.  Carollo testified that Moody was hanging loosely, and he was later moved into the crush zone when firefighters attempted to remove Moody from the vehicle.  However, Carollo was the only firefighter or paramedic who testified that Moody had room to move around, and his testimony was contradicted by at least three other firefighters.

Plaintiffs also cite the testimony of Vickie Weidner, M.D., an emergency room physician who was driving by the scene of the accident, as corroboration for the medical testimony of Dr. Burton.

While Ford's arguments raise questions about Dr. Burton's credibility, the Court does not have the freedom to reweigh the evidence on a motion for judgment as a matter of law.  Plaintiffs have shown that Dr. Burton's testimony was supported by sufficient eyewitness testimony.[6]  The jury also heard the same eyewitness testimony, and could have chosen to disregard the testimony of certain eyewitnesses or Dr. Burton if they did not find this evidence credible.  Ford had ample opportunity to question Dr. Burton about the basis for his expert opinions at trial, and Dr. Burton's credibility was an issue for the jury to determine.  Klein v. Grynberg, 44 F.3d 1497, 1503 (10th Cir. 1995) ("The court may not reweigh the evidence or substitute its judgment for the jury's.").  Although Ford argues that Dr. Burton admitted that he was not telling the jury "that there was anything wrong with this 1995 Ford Explorer,"[7] he would have greatly exceeded the permissible scope of his expertise if he had done so.  See Dkt. # 310, at 609.  Dr. Burton was a medical expert, not an automotive expert, and he did not have to give an opinion about the existence of a defect in the Explorer for plaintiffs to prove causation.

---

[6]    Ford takes issue with Dr. Burton's decision to credit Hickman's version of events rather than other eyewitnesses that Ford believes were more credible.  Dr. Burton stated the basis for his opinions, and he did not have to provide an "anatomical basis" to believe one witness over another.  Dkt. # 289, at 11.  Ford cross-examined Dr. Burton on these issues, but the fact that Dr. Burton relied on selected eyewitnesses when forming his opinions does not make his testimony wholly unreliable.

[7]    In response to a question from Ford's counsel, Dr. Burton agreed that the Explorer did a "good job of protecting both Tyler Moody and Brett Hickman" during the accident."  Dkt. # 310, at 607.  This does not undermine his testimony as a whole, as Dr. Burton was clear that Moody's death occurred after the vehicle came to rest.

Ford next argues that there was insufficient evidence to prove that Moody was conscious after the accident.  It claims that plaintiffs did not produce any evidence of Moody's conscious pain and suffering, and that plaintiffs should not have been permitted to argue conscious pain and suffering as an element of damages.  Ford admits that eyewitness testimony established that Moody moved his fingers after the accident, but it cites to a lack of evidence that Moody moved his arms and legs after the accident.  At trial, Ford cross-examined Dr. Burton about a 5 inch contusion on Moody's head and Dr. Burton admitted that the contusion could suggest that Moody was unconscious after the accident.  Plaintiffs produced the testimony of Hickman and several other eyewitnesses who claimed that Moody moved his fingers in response to questions, and that they believed Moody was conscious immediately after the accident.  Construing the evidence in favor of the non-moving party, the jury could reasonably have concluded that Moody was conscious after the accident.

Ford's next argument is based on the testimony of its engineering expert, Kenneth F. Orlowski ("Orlowski"), who "proved" via his spit roll test that an occupant's head will touch the roof of the vehicle without any roof crush if he is suspended upside down.  See Dkt. # 289, at 10. Based on Orlowski's testimony, Ford claims that plaintiffs' entire theory of the case, that roof crush pinned Moody in the vehicle, is irrelevant.  However, Ford's argument ignores the limited use for Orlowski's spit roll test, as evidenced by the Court's instruction to the jury on this issue:

> Defendant will show a video of an experiment called the Orlowski spit roll test.  This test is a demonstration to display the mechanical and physical principles involved in a rollover accident.  However the test was not an attempt to recreate the accident, nor was the test designed to replicate the exact conditions of the accident.  The video will be shown for demonstration purposes only, and you should not treat it as an exact recreation of the accident.  You must make allowances for the differences between the actual event and the demonstration evidence.

Dkt. # 314, at 1497-98. The jury was specifically instructed not to treat Orlowski's spit roll test as an indication of how much head space Moody would have had in the Explorer. Consequently, Orlowski's testimony, at least the parts cited in Ford's motion, do not conclusively prove that Moody's head would have touched the roof regardless of the amount of roof crush. Oklowski's testimony does not invalidate plaintiffs' theory of causation, as plaintiffs presented sufficient evidence for the jury to conclude that excessive roof crush caused Moody's death.

Ford relies on statements of plaintiffs' automotive design expert, Stephen Forrest ("Forrest"), suggesting that some roof crush is inevitable in any rollover accident. See Dkt. # 312, at 969 ("I would probably say that some degree of roof crush is inevitable, even with a good design, some minor amount."); id. at 975 (agreeing that "there are rollover accidents that would overwhelm even the strongest roof"). It is not entirely clear what Ford intends by referencing these statements. Forrest did not concede that roof crush could not have been a factor in Moody's death or that the amount of roof crush in this case was acceptable from an automotive engineering standpoint. Although Ford may take issue with the substance of Forrest's testimony, the jury was free to consider as much or as little of Forrest's testimony as it found credible, including the statements cited above. Based on the evidence presented at trial, a jury could conclude that the amount of roof crush in this case was excessive and that a defective roof caused Moody's death.

Ford's final argument concerning causation is that plaintiffs failed to produce evidence that, even if Forrest's alternate design had been adopted, Moody would have survived the accident. The Court can not find any Oklahoma case law suggesting that such a showing is necessary in a products liability case and, even if Forrest's alternate design would not have prevented Moody's death,

plaintiffs did not have to produce a viable alternate design to prevail at trial.[8]  This argument is primarily an attack on the credibility of Forrest and Dr. Burton and, as the Court has already stated, it will not weigh the evidence when ruling on Ford's motion.  Considering the evidence adduced at trial in plaintiffs' favor, including Forrest's and Dr. Burton's testimony, the jury had sufficient evidence from which it could find that a product defect caused Moody's death.

## B.

Ford argues that the undisputed evidence at trial showed that the Explorer met FMVSS 216, a minimum governmental safety standard for roof strength, and that plaintiffs failed to prove the Explorer was defective.  Ford presented evidence that FMVSS 216 requires a vehicle's roof to be able to withstand 1.5 times its own weight while crushing less than five inches.  The Court instructed the jury on the permissible use of this evidence at trial:

> In the course of the trial, evidence has been introduced to the effect that the two-door 1995 Ford Explorer Sport manufactured and/or sold by defendant complied with certain government standards.  Compliance with such standards does not bar recovery for manufacturers' products liability.

Dkt. # 263, at 24.  Ford did not object to this instruction, nor does Ford suggest that compliance with federal safety standards constitutes an absolute defense to a manufacturers' products liability action.  See Karns v. Emerson Elec. Co., 817 F.2d 1452, 1457 (10th Cir. 1987); Smith v. Minster Machine Co., 669 F.2d 628, 633 (10th Cir. 1982); Attocknie v. Carpenter Mfg., Inc., 901 P.2d 221, 224 (Okla. Civ. App. 1995).  However, Ford argues that plaintiffs did not prove the standard should be higher than FMVSS 216 and, therefore, plaintiffs did not show that the Explorer was defective.

---

[8]     Forrest did testify about an alternate design for the A-pillar and corner junction of the Explorer, and the jury could have found that this would have reduced the amount of roof crush.  The jury was not bound to conclude, as Ford suggests, that plaintiffs' entire theory of causation was wrong.  Construing the evidence in plaintiffs' favor, the jury could have concluded that reducing the amount of roof crush may have prevented Moody's death.

Plaintiffs argued that the accident at issue in this case was not severe, and that Ford should have foreseen the need to construct the roof with sufficient strength to withstand this kind of rollover. To refute plaintiffs' argument, Ford was allowed to put on evidence regarding the severity of the accident, including evidence of the vehicle's speed and its own accident reconstruction testimony. Forrest suggested that FMVSS 216 was an inadequate standard that would not protect a vehicle's occupants in the event of a rollover. Ford's motion selects certain, less favorable quotes from Forrest's testimony, but it mischaracterizes the thrust of Forrest's trial testimony. As the Court has stated above, compliance with FMVSS 216 is not an absolute defense, and the jury apparently concluded that the Explorer was defective, notwithstanding Ford's compliance with FMVSS 216. Plaintiffs presented sufficient evidence for such a jury finding, and the Court does have the authority under Rule 50 to reweigh the evidence. Based on Forrest's testimony, and construing the evidence in plaintiffs' favor, the Court finds that there was a legally sufficient basis for the jury to conclude that the Explorer was defective, and Ford's motion for judgment as a matter of law should be denied in its entirety.

## IV.

In the alternative, Ford claims that the conduct of plaintiffs' counsel during trial was so prejudicial to Ford that the verdict is unreliable, and a new trial should be ordered. Ford alleges that his misconduct inflamed the jury with a desire to punish Ford and impaired Ford's ability to present its defense at trial. Dkt. # 290, at 2.

## A.

11

Ford asserts that plaintiffs' counsel engaged in a series of deliberate acts intended to inflame the jury, including intentional violations of the Court's in limine rulings, inflammatory statements, and personal attacks against Ford's counsel and witnesses. Plaintiffs' counsel responds that he conducted his trial presentation in a professional manner and did not violate the Court's in limine rulings. Even if he unintentionally violated the Court's evidentiary rulings, plaintiffs' counsel argues that Ford did not object to every instance of alleged misconduct and that Ford was not prejudiced by plaintiffs' counsel's conduct. In its ruling on Ford's motion, the Court has reviewed the entire trial transcript, not just the parts cited by the parties, to determine if the trial was fundamentally unfair to Ford.

One preliminary matter is plaintiffs' argument that the Court should not consider any conduct to which Ford did not specifically object at trial. The general rule is that a party must make a timely objection during trial to preserve an issue for post-trial review. Neu v. Grant, 548 F.2d 281, 287 (10th Cir. 1977). The Tenth Circuit has recognized an exception to this rule when reviewing post-trial motions alleging attorney misconduct, holding that the district court can exercise its discretion to review allegations of misconduct without a timely objection when the "interest[s] of judicial fairness" so require. Ryder, 814 F.2d at 1424 n.25. This rule prevents the party who engaged in misconduct from raising the timely objection rule as a bar to post-trial review in cases of egregious misconduct. Id. Given the allegations of pervasive misconduct, a strict application of the timely objection rule would have placed Ford in the untenable position of making constant objections and antagonizing the jury. Anheuser-Busch, Inc. v. Natural Beverage Distributors, 69 F.3d 337, 346 (9th Cir. 1995). The Court will exercise its discretion to review the cumulative effect of the alleged misconduct, even when Ford failed to make a timely objection, because Ford has raised issues

12

concerning the fundamental unfairness of the trial.  The Court now turns to each allegation of trial misconduct raised by Ford in its motion.

*Other Similar Incidents*

Ford argues that plaintiffs violated the Court's pretrial ruling excluding evidence of other similar incidents.  At the pretrial conference, the Court considered Ford's motion in limine to exclude all references to other similar incidents involving Ford Explorers.  The Court stated:

> I can't make any ruling with regard to substantial similarity unless I hear about it, and the Court has to determine that the accidents are substantially similar.  You didn't give me the benefit of a Daubert hearing, therefore I can't find that any of them today are substantially similar.

> I am going to rule with regard to [Ford's motion in limine] that if Mr. Forrest is going to testify to other similar incidents I have to have a hearing outside the jury, and you-all are going to have to figure out when I do that, in order to determine whether any of the numerous other incidents he has on that chart are substantially similar, if . . . that would be relevant and appropriate to use.

Dkt. # 210, at 34-35.  The Court minutes of the pretrial conference specifically state that "if Forrest is to testify [about other similar incidents] there will be [a] hearing conducted outside the presence of the jury."  Dkt. # 204, at 1.  Before the trial, plaintiffs' counsel clearly had notice that other similar incidents were not to be discussed without a hearing on the substantial similarity of the other incidents.

From the very beginning of the trial, plaintiffs' counsel referred to the number of rollover accidents nationwide and this conduct continued through the entire trial.  In his opening statement, plaintiffs' counsel informed the jury about Forrest's proposed testimony:

> You will hear from another -- and I don't lightly say this -- worldwide expert on roof crush or roof compartment intrusion, . . . Mr. Steve Forrest. . . .  And he will tell you, what happened in this accident has happened literally thousands -- more than thousands of -- on other occasions with the Ford Explorer.  And he has studied

literally thousands and thousands of rollovers with these vehicles, that the roof just
collapses in.

Dkt. # 309, at 171.  Plaintiffs' counsel continued with this theme in his opening statement by telling

the jury that he would produce evidence that the Ford Explorer is "the number one SUV that rolls"

and that it is the "number one SUV who has its roof collapse."  Id. at 172.

During plaintiffs' direct examination of Dr. Burton, plaintiffs' counsel asked Dr. Burton in

how many Ford Explorer cases he had previously provided expert services.[9]  However, plaintiffs'

counsel then asked Dr Burton "what vehicle, more than any other, have you found roll over from

your investigation?"  Dkt. # 310, at 602.  Ford objected on the basis that this question violated the

Court's in limine ruling requiring plaintiffs' counsel to approach before introducing evidence of

other similar incidents:

> Ms. Quinn-Cooper: Your Honor, there was a very specific ruling and motions in
> limine about other similar incidents.  I think that this is trying to back-door in that
> information.  Also, there is no allegation that there was something about this vehicle
> which made it prone to roll over.  The only allegation in this case is, was the roof
> structure a safe and effective roof structure?  So I think it's irrelevant, in addition to
> being a violation of your order in limine.

> Mr. Brewster: Well, the issue is -- I was anticipating the cross-examination being
> that he testifies against other manufacturers.  She said that in her opening statement.
> So I thought it was only appropriate for him to be able to square up, if he's testifying
> against other manufacturers, the number one vehicle that he testifies regarding is the
> Explorer, just in anticipation . . . .

> The Court: How about you wait till [sic] redirect?

---

[9]     Over Ford's objection, the Court allowed plaintiffs' counsel to ask about Dr. Burton's past
experience with Ford Explorers to establish a foundation for Dr. Burton's testimony and to
show bias, if any.

Id. at 602-03.  Dr. Burton was plaintiffs' medical expert, not an engineering expert or an accident

reconstructionist.  This question was completely irrelevant to Dr. Burton's expert testimony, and was

designed to place prejudicial information before the jury.

Ford also takes issue with Forrest's unsolicited testimony about the number of Ford Explorer

cases in which he had testified.  Plaintiffs' counsel asked Forrest what he meant when Forrest

implied that this case was relatively straightforward:

> I've done a fair amount of work on this vehicle, the two-door and the four-door
> Explorers.  We do a lot of Explorer cases.  And I know what the weaknesses are.
> And when I looked at this vehicle for the first time, all the classic weaknesses were
> there.  The roof failures were all in the places that you see them over and over again
> in other Explorer cases and in the places that would be obvious by looking at a
> structural breakdown of the vehicle.  So I looked at the vehicle and said, well, it
> looks exactly like these other vehicles I've looked at.

Dkt. # 311, at 715-16.  Ford objected and the Court ordered plaintiffs' counsel to approach the bench

before questioning Forrest about other similar incidents.  Plaintiffs' counsel never requested a

hearing outside of the presence of the jury to seek admission of other similar incidents.  Later on,

Forrest made similar unsolicited, non-responsive comments about Ford Explorers in general, stating

"[w]e see this repeatedly in Ford Explorers and that -- the presence of a sun -- of an overhead

console will move the failure to one side or the other side of it, just by the presence of that thin strip

of sheet metal."  Dkt. # 316, at 889.

The most inflammatory references to other similar incidents came in plaintiffs' closing

argument.  From the very beginning of his closing argument, plaintiffs' counsel set the tone that

other accidents would be a major theme, as he stated:

> as the Moodys tried to sort through what happened January 16th, what took this
> young man's life, and they began to ask questions and talk to people, they began to
> understand that what took their son's life was a not-too-well-kept secret in Detroit
> concerning the manufacture of the Ford Explorer, not-too-well-kept secret because

when Ford Explorers roll, the roofs collapse.  273,000 rollovers in America, 24,000
serious injuries, 10,000 deaths.

Dkt. # 315, at 1631.  He refuted Ford's defense concerning the severity of the accident, stating that

Ford was "wrong," because "[t]his accident and the other 273,000 light truck/SUV rollovers that

occur in America are not very violent . . . ."  Id. at 1635.  He asked the jury to "[l]ook what's taking

lives around the country.  Look at these statistics."  Id. at 1649.  Most troubling is a statement by

plaintiffs' counsel during his final closing, where he once again addressed the statistics concerning

rollover accidents:

> And she says, you know, we got 98 percent rollovers.  Some roll over on just their
> side.  And we got 2 percent.  How about 24,000 people seriously injured?  Ten
> thousand killed a year?  We are all fed up with Iraq.  But in three years since 2003,
> 2400 U.S. soldiers have died.  But here we've got 10,000 killed by roofs, and that's
> okay for her and Ford.  I don't think so.

Id. at 1689.

In products liability cases, the Tenth Circuit permits parties to introduce evidence of other

similar accidents when the other accidents are "substantially similar" to the subject accident.  Ponder

v. Warren Tool Corp., 834 F.2d 1553, 1560 (10th Cir. 1987).  A finding of substantial similarity is

primarily based on a comparison of the other accidents to the plaintiff's theory of the case.  Wheeler

v. John Deere Co., 862 F.2d 1404, 1407 (10th Cir. 1988).  Evidence of other similar accidents can

be relevant to prove defendant's notice of a defect, the potential existence of a defect, or to counter

defense witness testimony.  Bitler v. A.O. Smith Corp., 391 F.3d 1114, 1126 (10th Cir. 2004).  The

requirement of substantial similarity can be relaxed if the evidence is introduced for the purpose of

proving notice of a defect, but the party seeking to introduce this evidence must still make some

showing of substantial similarity.  Four Corners Helicopters, Inc. v. Turbomeco, S.A., 979 F.2d

1434, 1440 (10th Cir. 1992).

16

In this case, plaintiffs did not present any evidence that Ford Explorers roll 273,000 times per year, cause 24,000 serious injuries, and kill 10,000 people every year.  Plaintiffs argue that Ford's expert, Orlowski, provided these numbers in response to questioning from plaintiffs:

> Q.  Have you seen statistics from NHTSA that put the number at about 273,000 in or around the time that this accident occurred, happening every year, in lights vehicle rollover crashes every year?
>
> A.  I can't disagree that later on, there was a few more thousand rollovers in the 220,000 that I had noted for the time period prior to the '95 Explorer being built.
>
> Q.  And would you dispute that there's about 24,000 seriously injured people every year in America and 10,000 killed from vehicle rollovers?  And that just includes people that are belted.
>
> A.  My data for that time says that 23,937 of the 355,000 rollover occupants were -- had an AIS of three or greater.
>
> Q.  How many killed?
>
> A.  Killed would be 9,801.

Dkt. # 314, at 1539-40.  Plaintiffs' counsel was questioning Orlowski about whether Orlowski had seen these statistics, and Orlowski was clear that he was referring to all rollovers during the year of 2004, not just rollovers involving Ford Explorers.

Although plaintiffs strongly disagree, Ford is correct that plaintiffs' counsel violated the Court's in limine ruling concerning the admissibility of other similar incidents.  Plaintiffs were permitted to question their own experts in general terms as to prior experience in cases involving Ford Explorers, but plaintiffs never moved for the admissibility of other similar incidents as substantive evidence.  Even if plaintiffs were using this evidence to show Ford's knowledge of a defect, plaintiffs had a duty to request a hearing outside the presence of the jury to prove that the incidents comprising the  statistics bore some similarity to an issue in the case.  Plaintiffs did not do

17

so.  The Tenth Circuit has recognized that this type of evidence has a strong impact on juries, as it tends to imply that a product is defective based simply on the occurrence of other accidents.  Four Corners Helicopters, 979 F.2d at 1440 ("In products liability actions, the occurrence of similar accidents or failures involving the same product has great impact on a jury, as it tends to make the existence of the defect more probable than it would be without the evidence.").  In one case, the Tenth Circuit held that the improper admission of seven prior complaints against Ford for an alleged steering defect with the 1968 Ford Bronco was prejudicial, and the case was remanded for a new trial on that basis alone.  Julander v. Ford Motor Co., 488 F.2d 839 (10th Cir. 1973).

Plaintiffs' counsel plainly and incorrectly stated that the statistics represented the number of rollovers, injuries and deaths caused by Ford Explorers in one year.  In his closing, plaintiffs' counsel referred to a "not-too-well-kept secret [that] when Ford Explorers roll, the roofs collapse.  273,000 rollovers in America, 24,000 serious injuries, 10,000 deaths."  Dkt. # 315, at 1631.  Plaintiffs' counsel claims that he "never once" suggested that these statistics applied specifically to Ford Explorers. Dkt. # 302, at 18.  As the passage quoted above shows, counsel clearly implied that Ford Explorers kill 10,000 people every year.  He claims that, even if he misrepresented the facts, his statements are not evidence and it should be assumed that the jury followed the Court's instructions.  In the context of a motion for new trial, inflammatory statements can provide a basis for granting a new trial, particularly when a large verdict suggests that the jury was influenced by passion or prejudice.  Whitehead v. Food Max of Mississippi, Inc., 163 F.3d 265, 278 (5th Cir. 1998).  Although courts should be hesitant to set aside a verdict based solely on improper remarks during closing argument, this Court should consider the prejudicial impact of plaintiffs' counsel's statements when ruling on Ford's motion for a new trial.  Lambert v. Midwest City Mem'l Hosp.

Authority, 671 F.2d 372, 375 (10th Cir. 1982) (Tenth Circuit reversed district court's decision to deny motion for new trial based on prejudicial remarks during closing statement).

When considering the pervasive nature of the alleged misconduct, the Court finds that Ford was likely prejudiced by plaintiffs' counsel's constant references to other accidents and his misrepresentation of the facts. Ford's repeated objections to plaintiffs' use of this evidence and the Court's rulings had no apparent impact on plaintiffs' counsel. The Court finds the reference to the Iraq war particularly troubling, given the inflammatory nature of the statement and the incorrect factual premise. Plaintiffs' counsel blatantly suggested that Ford Explorers were responsible for 10,000 deaths per year, and he had the temerity to compare this improper suggestion to the number of deaths in the Iraq war. Plaintiffs' counsel has offered no defense for this statement and, by itself, this statement likely prejudiced Ford's presentation of its case. This remark was made in his final closing argument, meaning that Ford had no opportunity to respond or cure any resulting prejudice. Plaintiffs have not refuted Ford's allegations of misconduct, and the Court will consider the prejudicial impact of plaintiffs' improper use of other similar incidents as a factor in ruling on the fairness of the trial as a whole.

*Punishment and "The Golden Rule"*

Ford alleges that plaintiffs' counsel violated the Court's in limine ruling excluding any mention of punishment in the liability phase of the trial and, by so doing, he encouraged the jury to punish Ford with its award of compensatory damages. At the pretrial conference, the Court informed the parties of its trial procedures concerning punitive damages:

> So if punitive damages are going to be an issue in this case, my rule is punitive damages are not mentioned in phase one, reckless disregard of the public safety may be mentioned, may be part of your opening statement, may be part of your closing argument. I submit a special interrogatory to the jury where they find whether they

do or do not find that the defendant's conduct was in reckless disregard of the public safety. Then and only then do we proceed to phase two where plaintiff may put on additional evidence relating to punitive damages and I have a separate set of phase two instructions and verdict forms. But statement of the case, opening statements, testimony from witnesses, closing argument, no mention of punitive damages unless and until you get a finding from the jury.

Dkt. # 210, at 7. In particular, Ford cites to several statements in plaintiffs' closing argument that Ford claims are requests for the jury to punish Ford with its liability phase damages award. In addition, Ford claims that plaintiffs made a "Golden Rule" argument, asking the jurors to place themselves in plaintiffs' position and to punish Ford accordingly. Plaintiffs' counsel denies these allegations and claims that his closing remarks were proper pleas in any case where punitive damages are at issue.

Beginning in his opening statement, plaintiffs' counsel subtly asked the jury to place themselves in plaintiffs' position:

You will learn that when I say it's foreseeable and preventable, that the Ford Explorer is the number one selling SUV in the marketplace. You'll learn it's the number one SUV that rolls. You'll learn it's the number one SUV who has its roof collapse. You'll learn that rolling of SUVs, particularly the Ford Explorer, is completely foreseeable by Ford. They know they're going to roll. It may well be something that is caused by the driver and losing control of his car. <u>It may well be that you're trying to avoid hitting a child that might run out in front of you. It may well be that you're trying to avoid someone else that has committed some kind of maneuver that you're trying to avoid hitting.</u> But these vehicles roll.

Dkt. # 309, at 172 (emphasis added). At the beginning of the passage, plaintiffs' counsel clearly refers to the jury as "you," and it appears that he is telling the jurors that they might personally be involved in a rollover accident. In closing argument, plaintiffs' counsel renewed this line of argument, stating:

It's going to happen. <u>It might happen when you're on your way to school. It might happen when your mom takes your kids to day care. It might happen when you're</u>

20

<u>in a rush to work.  It might happen because a child runs out in front of you, and you try to avoid it</u>.  It's going to happen.

Dkt. # 315, at 1636-37 (emphasis added).  The clear implication of this passage is that the jurors should place themselves in plaintiffs' position, because the same injury could happen to them.

An attorney may not "explicitly request a jury to place themselves in the plaintiff's position and do unto him as they would have him do unto them." <u>Stokes v. Delcambre</u>, 710 F.2d 1120, 1128 (5th Cir. 1983).  Under Tenth Circuit precedent, a party may not rely on a Golden Rule argument in his plea for damages, but such arguments are not improper on the issue of liability.  <u>Shultz v. Rice</u>, 809 F.2d 643, 651-52 (10th Cir. 1986).  A Golden Rule argument is "universally recognized as improper, because it encourages the jury to depart from neutrality and to decide the case on the basis of personal interest and bias rather than on the evidence." <u>Blevins v. Cessna Aircraft Co.</u>, 728 F.2d 1576, 1580 (10th Cir. 1984).  The question of whether Golden Rule arguments constitute reversible error depends largely on the facts of the case and the prejudice to the opposing party, and the district court must exercise its discretion to determine the proper remedy.  <u>Forrestal v. Magendantz</u>, 848 F.2d 303, 309 (1st Cir. 1988).

Plaintiffs' counsel's arguments in this case are classic Golden Rule arguments.  He specifically asks the jurors to place themselves in plaintiffs' position, and he implies that they will be harmed if Ford is not punished for its failure to design a safer automobile.  Plaintiffs cites <u>Marcoux v. Farm Services and Supplies, Inc.</u>, 290 F. Supp. 2d 457 (S.D.N.Y. 2003), where the court found that statements asking the jury to consider the gravity of the plaintiff's injury were not Golden Rule arguments.  <u>Id</u>. at 465.  That case is distinguishable from the present case.  Plaintiffs' counsel's remarks in this case went to the likelihood that jurors would suffer a personal injury similar to that suffered by plaintiffs' decedent, not to the seriousness of the injury, and he asked the jurors to award

damages as if they had personally been harmed.  Plaintiffs also argue that the references to "you" were general, and were not directed at the jurors.  As the Court has noted above, plaintiffs' counsel begins the passage in his opening statement by addressing the jury as "you," and it appears that he was referring to the jury throughout the passage when he continued to repeat "you."  Plaintiffs' counsel's  argument is unpersuasive.  Because of the prejudicial nature of these arguments and the likelihood that these statements aroused the passions of the jurors, plaintiffs' counsel's Golden Rule arguments should be considered as a factor in ruling on the fairness of the trial as a whole.

Also in his closing argument, plaintiffs' counsel made several appeals to the jury to consider punishment as a factor in their liability phase verdict:

> What we have is a company that is -- has all of the knowledge, all of the expertise, and all of the responsibility for us to manufacture a product that's not going to take our lives.  It's not going to take our children's lives.  It's not going to paralyze us. And the only way we can tell them that that's not acceptable is in this context, in this courtroom.  We have, then, the responsibility of saying, hey, wait a minute.  That's not good enough.  You can't put these vehicles on the marketplace and absolutely know what we've learned in this courtroom.  You can't do it.  You -- you don't have a conscience if you do that.  You have to stop.  You can't put these vehicles out there knowing that they're going to roll, and when they do roll, they're going to take lives, when there is such a simple solution.

Id. at 1640 (emphasis added).  Ford argues that, although plaintiffs do not specifically mention "punitive damages," this line of argument implies that the jury should consider punishment.  When plaintiffs' counsel was advising the jury on an appropriate amount for compensatory damages, he made the following plea for damages:

> In this case, ladies and gentlemen, there's no way to give a verdict for the plaintiff unless it be a verdict that is -- that speaks the loss.  And the damages are for his pain and suffering as he struggled to regain some semblance and tried to save himself. And I'm going to ask that you award $10 million.  That seems to be a large number, but small in comparison to that damage.  And then I'm going to ask that you award $10 million to each of the parents.  That number is small, and it pales in comparison to the loss.  And then if you will look at this case and feel like that damage is

> appropriate, I think if you speak and say, we're going to add a dollar to that, Ford
> will get the message that you really did understand the loss was huge, and it was
> directly caused.

Id. at 1654 (emphasis added).  This passage contains a direct reference to awarding damages beyond

pain and suffering, and suggests the jury should send a message with its liability phase verdict.  The

jury was asked to "add a dollar" to plaintiffs' counsel's plea for $30 million so that "Ford [would]

get the message," which is clearly a direct plea to include a punitive element with its award of

compensatory damages.  Id. at 1654.  Plaintiffs' counsel reminded the jury in his final closing

argument of the perceived need to hold Ford accountable:

> I look at terms, and I thought about this case, and I said, this issue is, I think, who has
> the knowledge of this?  They did.  Who has responsibility when they sell a product
> to the public of knowing what it's going to do and how it's going to be used?  They
> do.  Who has the power?   They do.  Who has the duty?  They do.  Who has
> accountability?  You do.  You must hold them accountable.

Id. at 1692.  While this could have been a proper argument on the issue of reckless disregard, Ford

claims this statement supported plaintiffs' claim for compensatory damages.

The structure of plaintiffs' closing supports the premise that this argument was directed at

actual damages because, in the next passage, plaintiffs' counsel refers to the jury's obligation to

consider reckless disregard as a separate issue from his previous arguments.  Id. at 1693.  The jury

was not informed that the trial might have a second stage.  Plaintiffs' counsel informed the jury of

this fact in violation of the Court's express order to the contrary, when he stated:

> I will tell you, ladies and gentlemen, that there's also a verdict dealing with the issue
> of their reckless disregard.  And the verdict form is going to ask this question.  It's
> going to say, "We do or do not find by clear and convincing evidence the defendant,
> Ford Motor Company, recklessly disregarded its duty to the public's safety."  And
> the answer is, we do.  Mark that we do, so we have an opportunity to talk to you
> again in this case very briefly.

Id. at 1693 (emphasis added).  Whether or not the jury clearly understood what plaintiffs' counsel was saying, this was a reference to the second phase of trial concerning punitive damages.  In light of counsel's other implied references to punishment and the amount of the verdict, it is likely that counsel's arguments inflamed the jury to include a punitive element in its award of actual damages.  He specifically requested that the jury punish Ford with its verdict, and he compounded this by raising the idea of a second stage.  There is a substantial likelihood that the award of compensatory damages contained a punitive element, especially in light of the size of the  noneconomic damages award.  The Court will consider this factor in ruling on the fairness of the trial as a whole.

*References to Internal Ford Documents Predating 1994*

Ford asserts that plaintiffs' counsel repeatedly violated the Court's in limine ruling excluding internal Ford documents predating the sale of the Ford Explorer.  Before trial, Ford filed a motion in limine to exclude references to "irrelevant internal Ford documents," and, in particular, a 1968 document known as the Weaver memorandum.  The Court granted Ford's motion, and expressed serious doubt that documents predating FMVSS 216 and the production of Ford Explorers were relevant:

> Well, it was before 216, it was before any design of SUVs, it was before the design of this particular model.  If you had something that went to the Explorer in a relevant time period where they made a cost benefit analysis I would have to look at it to see if it's relevant, you know, it would be [a] different thing than a 1968 decision.  I cannot show that there's any relevance to the mindset in the 1990s of a 1968 document.  So that is my ruling, and I understand that you have made your objection and you object to my ruling.  Unless something happens in the trial to convince me I'm wrong, I'm granting that portion of the motion in limine.

Dkt. # 210, at 48.  Plaintiffs were permitted to use historical documents for impeachment purposes, but they could not use pre-1994 historical documents as part of their case-in-chief.  Ford repeatedly

objected to plaintiffs' use of this evidence and, despite the fact that most of these objections were sustained, plaintiffs continually violated the Court's in limine ruling.

In opening statement, plaintiffs' counsel informed the jury that plaintiffs would introduce 1968 documents, even though the Court had ruled otherwise. Plaintiffs' counsel told the jury that:

> [Y]ou'll learn from Ford's own documents that Ford started understanding that when the law was passed in 1968 requiring manufacturers to put in upper restraints, the shoulder harnesses, that that caused the people in vehicles to be seated directly such that they didn't move during an accident and made them very vulnerable to roof collapse. And with the advent of these shoulder harnesses beginning in 1968 -- and you'll see the documents from Ford.

Dkt. # 309, at 172-73. Ford objected, and the objection was sustained. This issue did not resurface until plaintiffs called Forrest to testify, and Ford filed a notice with the Court reminding the Court and the parties that inadmissibility of the historical documents had been ruled on. Dkt. # 236. Forrest made several passing references to 1960s documents but, after plaintiffs made repeated attempts to elicit testimony about the substance of the documents, Ford requested a bench conference. The Court clarified its previous ruling, and explained the permissible uses, if any, of historical documents:

> I reviewed my ruling in limine. And I think it was correct. And this is, I think, the appropriate way to proceed. I had ruled that -- I don't know what the Weaver document is and how much this relates to the Weaver document. But I have ruled that it was [in]admissible [sic] because it was so distant in time from the '95 Ford Explorer Sport. However, when the Ford witnesses take the stand, you can ask them what they know about forces and roof crush and the extent of their knowledge. And if -- you can use those documents for impeachment if there's testimony that at the time of the development of the Ford Explorer, they didn't know about the information that was contained in those documents.

Dkt. # 311, at 787-88.

Despite the Court's ruling, Forrest persisted in his attempts to discuss the 1968 document, and he violated the Court's evidentiary ruling in spectacular fashion. Plaintiffs' counsel questioned

Forrest about Ford's knowledge of alternate designs for corner junctions and A pillars, and the Court

advised Forrest not to discuss Ford's knowledge before 1994:

> Q.      [By Mr. Brewster] With regard to the foam that you told us about, is that something that you have ever read that Ford knows about?
>
> A.      Sure.
>
> Q.      What do you mean?
>
> A.      Well, how far can I go back.
>
> The Court:      Let's limit ourselves to 1994?
>
> The Witness:   Okay.  Well, that cuts out a lot of it.  There's knowledge well before that, but  I won't go into it, I guess.
>
> Ms. Quinn-Cooper:  Objection, Your Honor, to the statements of the witness in response to --
>
> The Court:  Let's talk about the Explorer Ford and the time period relevant to this vehicle.

Dkt. # 316, at 905-06.  Ford objected, but the damage was already done.  Forrest directly stated that

Ford had knowledge of safer alternate designs before the subject vehicle was ever designed and

manufactured, and the Court had repeatedly told plaintiffs that this evidence was irrelevant and

inadmissible at trial.  This was particularly troubling coming from an experienced expert witness

such as Forrest, who arguably knew the effect his improper remark would have on the jury.  Even

after this exchange, Forrest continued to refer to 1960s internal Ford documents, suggesting that the

Court's evidentiary ruling had no impact on his testimony or plaintiffs' counsel's questioning.  See

Dkt. # 312 at 966.

During his cross-examination of Ford's witnesses, plaintiffs' counsel continued to refer to

historical documents.  Ford objected several times and each objection was sustained.  See Dkt. #

314, at 1525-26 (plaintiff's counsel admonished not to cross-examine Orlowski about contents of Weaver memorandum); id. at 1528 (plaintiffs' counsel attempts to hand witness 1970 Ford document excluded by Court's ruling); id. at 1534 (plaintiffs' counsel cross-examines witness about contents of a 1977 Ford document).  When objections are sustained, it is ordinarily presumed that no prejudice results to the objecting party.  Abuan, 353 F.3d at 1175.  However, plaintiffs' counsel's repeated attempts to introduce evidence that the Court had unequivocally declared to be irrelevant, as well as Forrest's disregard of the Court's ruling, show that Ford's objections were not sufficient to cure any prejudice from plaintiffs' violations of the Court's evidentiary rulings.  Although the documents were not admitted into evidence, the repeated questioning suggested the contents of these documents, in violation of the Court's ruling.  The Court will consider this conduct in ruling on the fairness of the trial as a whole.

*Ford's Lobbying of the National Highway Traffic Safety Administration ("NHTSA")*

Ford argues that plaintiffs' counsel intentionally violated the Court's in limine ruling excluding evidence of Ford's lobbying activities with NHTSA.  Ford filed a motion in limine to exclude evidence that Ford pressured NHTSA to adopt a lower standard for FMVSS 216, and the Court stated that it was "not having a lobbying trial."  Dkt. # 210, at 35.  The motion was granted in part and denied in part as follows:

> Certainly [plaintiffs] can ask whether or not there was input into the development of the standard and the relationship with NHTSA, and then if anything else comes up where [plaintiffs] feel like they need to introduce additional evidence regarding -- I'm not going to allow other manufacturers -- whether Ford influenced NHTSA, in particular [FMVSS 216], then approach the bench.

Dkt. # 210, at 37.  Plaintiffs' counsel interpreted the Court's ruling to prevent commentary about whether Ford or other automakers had a right to lobby NHTSA, but he argues that the Court did not preclude the use of the word "lobby" or evidence of Ford's influence in developing FMVSS 216.

During opening statement, plaintiffs' counsel suggested that Ford's lobbying activities would be a central theme in his case-in-chief.  Plaintiffs' counsel criticized FMVSS 216 and implicated Ford as a critical actor in the alleged inadequacy of this standard:

> You'll learn that NHTSA promulgated a rule beginning in, you'll learn, in the '70s and then '80s, and as it applied to light trucks and SUVs in 1991, beginning with the '94 model.  They received a lot of dialogue from the auto industry in lobbying. You'll see, in spite of Ford's own studies, which show at least two times, they started lobbying NHTSA for just one-time roof strength because they're worried about, well this may cost us.  And they calculated the cost at meeting two-times strength at $10 a roof.  But that was too much.  And they had a negotiation paper that was an internal document that said, when you negotiate with NHTSA, tell them that the bigger problem is people being ejected . . . .

Dkt. # 309, at 175-76.  Before plaintiffs could begin to question Forrest about lobbying activity, Ford raised the issue, and the Court reminded plaintiffs' counsel that this was not a lobbying case. The Court specifically told plaintiff that the negotiation document, referred to in plaintiffs' opening statement, would not be admitted as substantive evidence and could not be used during Forrest's direct examination.  Dkt. # 311, at 789-90.  Plaintiffs' counsel examined Forrest at length about Ford's lobbying activities, which culminated in plaintiffs' counsel asking Forrest about the contents of the excluded negotiation document.  Ford objected, and the objection was sustained.  Id. at 794. In this instance, plaintiffs' counsel dropped this line of questioning following Ford's objection.

However, plaintiffs' counsel picked up the theme in his closing argument that FMVSS 216 was an inadequate standard, in part, because of the close ties between NHTSA and auto manufacturers:

> 216 is a standard that's promulgated by the National Highway Traffic Safety Administration.  Think about it.  You heard Mr. Forrest say, who is involved in NHTSA? The auto manufacturers. Who lobbies NHTSA? The auto manufacturers. Where do NHTSA employees go when they leave there?  Auto manufacturers.  That is what's going on.

Dkt. # 315, at 1638.  Ford argues that plaintiffs "tunneled underneath" Ford's primary defense, compliance with FMVSS 216 to prove the lack of a defect, with improper references to the inadequacy of FMVSS 216.  In this instance, Ford has failed to show that this line of argument by plaintiffs' counsel caused any prejudice at trial.  By relying on FMVSS 216 as a defense, Ford opened the door to arguments about the adequacy of this standard, and plaintiffs had a right to rebut Ford's defense.  Although plaintiffs' counsel may have made remarks in his closing about lobbying activity that technically violated the Court's evidentiary ruling, Ford has not shown that this was a substantial source of prejudice.

*Total Payments to Ford's Expert Witnesses*

At the pretrial conference, Ford expressed concern that plaintiffs' counsel would attack the credibility of Ford's experts with inflammatory references to the total payments by Ford to an expert's firm.  For example, Ford believed that it would be prejudicial for plaintiffs' counsel to impeach an expert by asking if Ford had paid his firm $22 million over the last 5 years.  The Court clarified the questioning that it would allow:

> It is certainly appropriate to ask what experts are charging for this case by the hour in total, how many times in the last five years they have testified for the attorneys or the party at issue.  You can ask about the firm that they belong to, whether they have ownership . . . in the firm.  And at this point, my ruling is going to be: And hasn't Ford paid millions of dollars to your firm over five years?  I think the number 22 [million] in and of itself is inflammatory and unduly prejudicial . . . .

Dkt. # 210, at 55 ln. 16-24.  Plaintiffs characterize this ruling as preliminary, and suggest that the Court's ruling authorized plaintiffs' counsel to impeach Ford witnesses by asking about the total payments to their firms.

At trial, plaintiffs' counsel asked Ford's corporate representative, Deborah Marth, Ph.D., "how many millions of dollars" Orlowski had been paid by Ford.  Dkt. # 313, at 1169.  The Court stated that its motion in limine ruling would stand and, although plaintiffs' counsel could ask about a witness's personal knowledge of payments from Ford, he could not simply throw out specific numbers as a method of impeachment.  Id. at 1170.  Plaintiffs' counsel blatantly disregarded the Court's ruling by asking Kevan Granat ("Granat"), Ford's accident reconstruction expert, if Ford had paid his firm $60 million over the last ten years.  Even though defense counsel immediately objected, the harm was already done.  This was exactly the type of inflammatory dollar amount the Court's ruling was intended to keep from the jury.[10]  Ford moved for a mistrial, but the Court denied Ford's motion.  However, the Court stressed that this was not a proper method of impeachment, and that throwing out a number, such as $60 million, would serve only to prejudice the jury against Ford.  Id. at 1301-02.  By asking such questions, plaintiffs' counsel was essentially testifying as the amount.  Although the Court did not grant Ford's motion for mistrial, the Court recognizes the prejudicial nature of plaintiffs' counsel's improper cross-examination.  The Court will consider this conduct in ruling on the fairness of the trial as a whole.

---

[10]     Plaintiffs' counsel properly asked Ford's biomechanics expert, Alfred Bowles, M.D., if he had personal knowledge of the total payments from Ford to his firm.  The Court permitted this questioning over Ford's objection.

*Post-Sale Regulatory Activity*

Ford's final allegation that plaintiffs violated the Court's in limine rulings concerns the use of a notice of proposed rulemaking ("NPRM") issued by NHTSA in 2005.  Before trial, the Court ruled that "post-sale statements will not come in unless they reflect presale knowledge." Dkt. # 210, at 58.  Ford argues that plaintiffs' counsel violated this ruling, and that it was prejudiced by plaintiffs' factual misrepresentation that Ford had presale knowledge of a defect.

At trial, plaintiffs' counsel attempted to question Dr. Marth concerning her knowledge of the 2005 NPRM.  Plaintiffs' counsel argued that this document was relevant to his cross-examination of Dr. Marth, because the NPRM referenced a 1994 study discussing the presence of the windshield during FMVSS 216 testing.[11]  At the time, plaintiffs' counsel could not provide an accurate citation for the study, and it was not clear that the 1994 study dealt with "windshields busting out during rollovers and why windshield delamination is such that it should not be in tact [sic] when [Ford does] a 216 study." Dkt. # 312, at 1145.  The Court permitted plaintiffs' counsel to inquire as to Dr. Marth's knowledge of the study.  However, when plaintiffs' counsel referred directly to the 2005 NPRM, the Court sustained Ford's objection to that line of questioning.  The Court has reviewed the transcript and does not find that Ford was prejudiced by that line of questioning, although it was arguably improper.  Dr. Marth denied any knowledge of the contents of the 1994 study and it was not admitted into evidence.  Although a juror could conceivably have inferred that Ford's FMVSS 216 results were inflated, there was no such explicit argument.  Ford's objection was sufficient to cure any prejudice, and it is unlikely that Ford was prejudiced by this evidence.

---

[11]     Plaintiffs argued at trial that the Ford's FMVSS 216 results were inflated, because Ford left the windshield in during the test.  Forrest testified that the windshield often broke loose during an accident, and did not provide support for the roof in most accidents.

*Plaintiffs' Counsel's Alleged Attacks on Ford's Witnesses and Ford's Counsel*

Ford argues that plaintiffs' counsel personally attacked Ford's witnesses and counsel, and this prejudiced Ford when presenting its defense at trial.  Plaintiffs' counsel responds that this was a hard-fought case and, although he may have been dramatic at trial, this was an emotional case and his conduct fell within the bounds of zealous advocacy.  The Court has reviewed the entire trial transcript in considering this aspect of Ford's motion, and finds that Ford greatly understated the prejudicial conduct of plaintiffs' counsel at trial.

The transcript shows that plaintiffs' counsel made unnecessary personal attacks against Ford's witnesses.[12]  In particular, plaintiffs' counsel's conduct towards Dr. Marth was personally and professionally abusive.  When cross-examining Dr. Marth about Ford's practice of running multiple FMVSS 216 tests, he implied that she should be held personally responsible for Ford's practices:

> How about you do one, and your standard is 1.875 because you know you got to get there to reach the rest of the production, and you don't?  So you say, Bob, bring me another one, and you don't.  Bob, bring me another one, and the windshield breaks, like you know it would.  And that -- we throw that one out.  Bob, bring me another one, and it doesn't.  And then you say, you know what?  Hey, let's get some guys from upstairs over here and figure out how we can just use these three to make it go.  How about that?  And then we'll type up a deviation standard.  Is that the way it works?

---

[12]    Plaintiffs' counsel responds that Ford made similar attacks against plaintiffs' witnesses.  The Court has reviewed plaintiffs' counsel's allegations and finds a material difference between defense counsel's statements and plaintiffs' counsel's blatant personal attacks.  Ford's counsel directly addressed the potential bias of plaintiffs' experts, while plaintiffs' counsel attacked Ford's witnesses and counsel on a personal level concerning matters wholly unrelated to plaintiffs' case.  Plaintiffs' counsel's claim that defense counsel engaged in similarly offensive conduct is unfounded.

Dkt. # 312, at 1155.  The Court sustained Ford's objections that plaintiffs' counsel was abusing the witness and testifying.  During his closing argument, plaintiffs' counsel impugned Dr. Marth's credibility because she was "attractive":

> Ms. Marth is an incredibly attractive young woman that is brought in here as a professional representative.  She doesn't work for them anymore.  But she's the voice of Ford.  What do you think the advertising department had to do about that?  Commercial department?  Let's get somebody that's real attractive, that won't look like they're going to deceive anyone, and let's put them on the stand, young doctor, Marth, Ph.D.

Dkt. # 315, at 1643.  Plaintiffs' counsel could certainly point out any potential bias Dr. Marth might have in favor of Ford,[13] but it is difficult to see how her personal appearance was relevant to the validity of her testimony.

Plaintiffs' counsel repeatedly placed Dr. Marth in a position to accept personal responsibility for deaths caused by rollover accidents.  When questioning Dr. Marth about the causal connection between roof crush and occupant injury, he asked Dr. Marth:

> Q.   Now, did you give testimony -- that's my question -- under oath in a court, at Ford, it's their position that there's no relationship between roof deformation and occupant injury or death in a rollover?  There's no causal relationship, right?
>
> A.   Right.
>
> Q.   Okay.  And that's what you would tell the persons that were at the scene of the accident extricating Tyler Moody that was crushed by the roof?  There's no relationship --
>
> Ms. Quinn-Cooper:    Objection, Your Honor.
>
> The Court:    If you could rephrase the question, please.

---

[13]   Plaintiffs' counsel properly elicited testimony going to Dr. Marth's potential bias in favor of Ford, including her extensive employment history with Ford and her post-employment consulting work on Ford cases.  He also showed that Ford paid for Dr. Marth's graduate education.

Mr. Brewster: Okay.

Q.      (By Mr. Brewster) That's what you would tell anyone that witnessed him
        clam-shelled into this vehicle --

Ms. Quinn-Cooper:    Your Honor, objection.  May we approach, please?

The Court: She's objecting to your characterization.

Ms. Quinn-Cooper:    Yes.

Mr. Brewster: Okay.  All right.

Dkt. # 312, at 1140.  The inflammatory questioning continued, as plaintiffs' counsel asked Dr. Marth why Ford did not do drop testing on the Explorer to see "whether it's going to fall in there and kill somebody?"  Id. at 1151.  When Ford's objection to this question was sustained, plaintiffs' counsel rephrased the question by asking Dr. Marth why Ford did not perform a drop test to determine "whether the roof was going to collapse and kill somebody."  Id. at 1151.  The Court admonished plaintiffs' counsel that the cause of the injury was for the jury to decide but, from his inflammatory questioning, he damaged Dr. Marth's credibility and planted a seed that Ford was willfully ignoring evidence that roof crush could kill the occupant of an Explorer.

Dr. Marth was not the only witness who suffered from inappropriate attacks by plaintiffs' counsel.  Plaintiffs' counsel asked Granat whether the Society of Automotive Engineers had a code of ethics and, when Granat was unsure if such a code existed, counsel commented that he wouldn't be surprised if that were true.  Dkt. 313, at 1306.  The Court directed plaintiffs' counsel to refrain from commenting on the evidence.  When Dr. Bowles was testifying that he was often required to read x-rays in his capacity as an emergency room physician, plaintiffs' counsel accused Dr. Bowles of committing malpractice:

A.      [by Dr. Bowles] I wish I had that luxury where I work. Where I work, the radiologists don't come in till [sic] the following morning. I read the films where there's cross-table c-spines, chest x-rays, extremity fractures. I have to read them. I have to act. I have to treat them. I wish I had the luxury.

Q.      You know what they call that?

A.      I'm sure you've got another catchphrase.

Q.      Malpractice, don't they.

Ms. Quinn-Cooper:    Your Honor --

The Court:      Mr. Brewster –

Mr. Brewster: No, I meant that sincerely.

Ms. Quinn-Cooper:    Objection.

The Court:      Ladies and gentlemen, you're going to be instructed to ignore that last question. Mr. Brewster, please move on.

Mr. Brewster: Okay. That's --

Q.      (By Mr. Brewster) I mean, general surgeons reading x-rays with the benefit --

The Court: Mr. Brewster, I've asked you to move on, please.

Id. at 1392-93. Plaintiffs' counsel could not be restrained in his abuse of Ford's witnesses, despite frequent admonitions from the Court.

Plaintiffs' counsel also directly attacked defense counsel during his closing argument when referring to the number of rollover accidents and injuries that occur every year:

And she says, you know, we got 98 percent rollovers. Some roll over on just their side. And we got just 2 percent. How about 24,000 people seriously injured? Ten thousand killed a year? We are all fed up with Iraq. But in three years since 2003, 2400 U.S. soldiers have died. But here we've got 10,000 killed by roofs, and that's okay for her and Ford. I don't think so.

35

Dkt. # 315, at 1689-90 (emphasis added).  Plaintiffs' counsel does not deny that this was a personal

attack on defense counsel, but responds that defense counsel made similar comments in her closing

argument.  However, plaintiffs' counsel does not include a single citation to the transcript in support

of this statement and the Court, during its review of the transcript, has found no support for this

argument.  The most egregious attack on defense counsel implicated Ford's credibility and implied

that defense counsel was intentionally misleading the jury:

> They can use all the trick photography they want.  They can get on their bellies and
> take a picture of the B-pillar and say, look at how much room that's in here.  I will
> give her any verdict if she could crawl in there.  I can't.  It's not possible to crawl in
> this vehicle because the roof is below the steering wheel. . . . She can take all the
> trick photography -- this is a straight shot.

Dkt. # 1689-90.  The jury could draw its own conclusion about the evidence without plaintiffs'

counsel's attack on defense counsel, and the only reason for making such a statement would be to

prejudice Ford.  Plaintiffs' counsel's improper attacks on the credibility of Ford's witnesses and

defense counsel exceeded the bounds of zealous advocacy, and these comments likely prejudiced

Ford.  The Court will consider this conduct in ruling on the fairness of the trial as a whole.

## *Damages*

Ford asserts that the proper remedy in this case is a new trial, not remittitur, because an

excessive verdict that results from passion or prejudice can not be cured simply by reducing the

amount of damages.   Mason v. Texaco, Inc., 948 F.2d 1546 (10th Cir. 1991).  In the alternative,

Ford argues that the damages award is excessive and should be remitted to prevent a miscarriage of

justice.  The Tenth Circuit has stated that "[t]he fixing of damages is 'peculiarly a function of the

jury' and its determination will not be overturned unless it is 'grossly excessive.'" State Office

Systems, Inc. v. Olivetti Corp. of America, 762 F.2d 843, 846 (10th Cir. 1985).  In order to find that

a verdict was the result of passion or prejudice, it must be manifest that the damages awarded were unreasonable. Rosen v. LTV Recreational Development, Inc., 569 F.2d 1117, 1123 (10th Cir. 1978). Plaintiffs respond that the Court should not even consider this argument, because Ford conceded damages at trial by failing to argue damages during its closing argument. Plaintiffs also contend that the amount of damages is reasonable based on the evidence presented at trial, and that this damages award was consistent with other verdicts for noneconomic damages in recent cases.

The Court does not find that Ford conceded damages. Ford had no idea until final closing argument that plaintiffs' counsel would suggest a figure of $ 30 million. Further, until the verdict, Ford had no idea if there would be an award of damages. Plaintiffs cite May v. Ernst-Eichman Machinery Co., Inc., 1990 WL 198832 (W.D. Mo. 1990), for the proposition that a party must object to the opposing party's prayer for damages to complain about the excessiveness of a verdict after trial. Id. at *16. In May, the court found that defense counsel failed to address damages during his closing argument but, even if he had, the court would still find that the verdict of $3.5 million was supported by the evidence. This Court disagrees with the May court waiver finding.   Even if the Court were to adopt the reasoning of May, it would still have an obligation to consider the reasonableness of the jury's verdict in light of the evidence presented at trial.  Ford's counsel discussed its decision not to argue damages as part of its closing argument, but there was no indication that Ford was conceding the issue. Dkt. # 315, at 1629-30.  Ford correctly points out that plaintiff has the burden to prove damages.  Worsham v. Nix, 145 P.3d 1055, 1063 (Okla. 2006) (plaintiff has the burden to prove noneconomic damages); Burlington Northern & Santa Fe Ry. Co. v. Bruce, 77 P.3d 615, 619 (Okla. Civ. App. 2003) (plaintiff in tort case must prove measure of damages with substantial certainty and show that damages were caused by defendant). Ford has not

conceded damages or waived its claim that the damages in this case are excessive, and the Court will now turns to Ford's argument that the jury's verdict was excessive.

Plaintiffs argue that the Court should presume the damages are reasonable, because the damages are half of the amount plaintiffs' counsel requested in his closing argument. Plaintiffs have offered no legal support for this argument. Implicit in this argument is that plaintiffs' request for $30 million in noneconomic damages was reasonable. However, there is no objective evidence in the record to support this claim for damages, and the Court refuses to make a subjective determination about the reasonableness of plaintiffs' request. The jury was free to weigh the evidence presented at trial and come to a conclusion about the proper measure of damages, but simply because the jury awarded $15 million, half of plaintiffs' requested damages, does not create a presumption of reasonableness. The fact that the jury's verdict was less than the amount plaintiff' requested does not insulate the verdict from judicial review but, of course, the Court will apply the stringent standard applicable to post-trial review of a jury's verdict, and it will overturn the damages award only if it finds that the verdict was clearly the result of passion or prejudice. Campbell v. Bartlett, 975 F.2d 1569, 1577 (10th Cir. 1992).

Ford argues that the award of noneconomic damages in this case, $15 million, is unprecedented under Oklahoma law, and that such an excessive verdict shows that the jury was motivated by passion or prejudice. Plaintiffs cite two cases with similar verdicts, but neither case is relevant to the Court's consideration. First, plaintiffs cite McGee v. City of Tulsa, 03-CV-704-CVE-PJC (N.D. Okla.). In that case, the plaintiff alleged that he was wrongfully imprisoned for fourteen years, and the jury awarded him $14.5 million. That case is factually distinct from a manufacturers' products liability action and, in any event, the judgment was vacated when the case

settled after trial.  The verdict was never reviewed for reasonableness or otherwise by post-trial ruling.  Plaintiffs also cite Burke v. State of Oklahoma, CJ-2003-6690 (Tulsa County District Court), where the jury awarded $20 million against multiple defendants for negligently placing a 7-month old child in an abusive foster home, leading to the child's death.  This verdict has not been reviewed on appeal, and the trial court has not ruled on the defendants' motion for remittitur or new trial. Given the factual distinctions and the lack of finality, Burke is not helpful to this Court's review of the $15 million judgment for plaintiffs.

The largest verdict this Court has found for noneconomic damages in a wrongful death case reviewed by the Oklahoma Supreme Court is $5 million.  See Johnson v. Ford Motor Co., 45 P.3d 86 (Okla. 2002).  Most verdicts, even in wrongful death cases, are significantly less than $5 million, with verdicts for compensatory damages rarely exceeding $2 million.  The $15 million verdict for compensatory damages supports Ford's theory that the jury was motivated by a desire to punish Ford with its verdict, and such a verdict may not survive judicial scrutiny.  See Sisk v. Manzanares, 270 F. Supp. 2d 1265, 1276 n.39 (D. Kan. 2003) ("it is highly improbable that the $10 million verdict for purely noneconomic loss could have withstood post-trial and/or appellate scrutiny").  Considered in light of Ford's substantiated allegations of trial misconduct and a review of verdicts in other similar cases, the $15 million award for purely noneconomic loss supports Ford's claim that the jury was motivated by a desire to punish Ford with its verdict.

**B.**

The Court recognizes that a jury's verdict should be set aside with great caution, and that such a measure is rarely appropriate.  Telecor Communications, Inc. v. Southwestern Bell, 305 F.3d 1124, 1143 (10th Cir. 2002); White v. Conoco, Inc., 710 F.2d 1442, 1443 (10th Cir. 1983).  In most

cases, "improper remarks will [not] engender sufficient prejudice to mandate the granting of a new trial." Fineman v. Armstrong World Indus., Inc., 980 F.2d 171, 207 (3d Cir. 1992).  However, repeated attempts to prejudice the jury by introducing irrelevant evidence and making inflammatory statements may require a court to order a new trial to prevent prejudice to the opposing party. Draper v. Airco, Inc., 580 F.2d 91 (3d Cir. 1987) (reversing district court's denial of motion for new trial because of repeated prejudicial statements in plaintiff's closing argument).  The Supreme Court has held that improper attacks on a parties' credibility "tending to stir the resentment and arouse the prejudice of the jury" can create grounds for a federal district court to order a new trial.  New York Cent. R. Co. v. Johnson, 279 U.S. 310, 318 (1929).

The Court has performed a quantitative assessment of the trial errors.  To recap, plaintiffs' counsel violated in limine rulings as to other similar incidents, punishment and the Golden Rule, historical internal Ford documents, payments to expert witnesses, and he made personal attacks on Ford witnesses and counsel.  The combination of these violations, along with plaintiffs' counsel's improper conduct, leaves this Court with a firm conviction that Ford did not receive a fair trial.  The Court has no choice but to order a new trial.  The Court has considered remitting the verdict, but Tenth Circuit precedent is clear that when a jury's verdict was the result of passion, prejudice or bias, the proper remedy is to order a new trial.  Mason, 948 F.2d at 1561.  The trial transcript confirms that plaintiffs' counsel sought to inflame the jury.  Beginning in his opening statement, plaintiffs' counsel violated the Court's in limine rulings excluding evidence of other similar incidents and internal Ford documents.  Plaintiffs' counsel's repeated disregard for the Court's rulings, his "Golden Rule" argument, and his direct references to accountability and "sending a

message," lead to the conclusion that the jury's award of noneconomic damages was partially punitive in nature.

Plaintiffs argue that the Court can not order a new trial simply as a punitive measure to correct perceived violations of the Court's evidentiary rulings.  See Maricopa County v. Maberry, 555 F.2d 207, 219 (9th Cir. 1977).  The Court's decision to grant a new trial here should not be viewed as a punishment to plaintiffs but, instead, as a necessary corrective measure for the Court to protect the rights of all litigants that come before it.  Ford has shown that it was prejudiced by plaintiffs' counsel's conduct, and the jury's unprecedented verdict for noneconomic damages supports this conclusion.  Based on the cumulative error in this case and the size of the jury's verdict, the Court has no doubt that the proper remedy is to order a new trial.  Failure to do so would amount to an abuse of discretion.

## V.

For the re-trial, the Court notes that the Supreme Court's recent decision in Philip Morris USA v. Williams, 127 S. Ct. 1057 (2007), will be applicable, and this will affect the presentation of evidence related to plaintiffs' claim for punitive damages.  During the first trial, plaintiffs' counsel relied on evidence of harm to others as part of his argument that Ford acted in reckless disregard of the public safety.

In Philip Morris, the family of Jesse Williams ("Williams"), a long-time smoker, sued Philip Morris USA ("Philip Morris") for negligence and deceit. 127 S. Ct. at 1060-61.  The jury concluded that Williams' death was caused by smoking, and found for the plaintiffs on their claims for negligence and deceit.  On plaintiffs' claim for deceit, the jury awarded $821,000 in compensatory damages and $79.5 million in punitive damages.  The trial judge determined that the punitive

damage award was excessive and reduced the punitive damages to $32 million.  Both parties appealed, and the Oregon Court of Appeals reinstated the full award of punitive damages.  Id. at 1061.  The Oregon Supreme Court denied review.  Philip Morris appealed to the United States Supreme Court, and the case was remanded for further review in light of the Supreme Court's decision in State Farm Automobile Insurance Co. v. Campbell, 538 U.S. 408 (2003).  Philip Morris raised two arguments on remand: (1) the jury should not have been permitted to consider injuries to third parties not before the court when awarding punitive damages; and (2) the punitive damages award was excessive under Campbell.  Philip Morris, 127 S. Ct. at 1061-62.  The Oregon Supreme Court rejected both arguments, and Philip Morris once again appealed to the United States Supreme Court.

The Supreme Court held that Philip Morris' rights under the Due Process Clause of the Fourteenth Amendment were violated when the jury considered harm to third parties as a factor when determining the amount of punitive damages.  Id. at 1063.  The Court stated that "a defendant threatened with punishment for injuring a nonparty victim has no opportunity to defend against the charge" by raising possible defenses to those claims.  Id.  If juries were permitted to consider harm to nonparties, this would create "a near standardless dimension" to punitive damages, and juries would be permitted to speculate about the harm to nonparty victims.  Id.  Although the jury may consider potential harm when determining the reprehensibility of the defendant's conduct, this means only that the jury may consider the potential harm to the plaintiff, not all other potential victims.  The Court concluded that the "Due Process Clause requires States to provide assurance that juries are not asking the wrong question, i.e., seeking, not simply to determine reprehensibility, but also to punish for harm caused to strangers."  Id. at 1064.  Under Philip Morris, a jury may consider

42

the fact that the defendant's conduct is likely to harm third parties as an indication of reprehensibility, but the jury must be instructed not to award damages for actual or potential injuries to third parties.  Id.  Oregon's punitive damages procedures were unconstitutional to the extent that they permitted the jury to award punitive damages for harm to nonparties, and the case was remanded for further proceedings.

Oklahoma's punitive damages statute, Okla. Stat. tit. 23, § 9.1, permits a jury to award punitive damages if the plaintiff presents clear and convincing evidence that a defendant "has been guilty of reckless disregard for the rights of others." On its face, the statute contemplates harm to third parties as the foundation for any award of punitive damages.[14]  The Oklahoma Supreme Court has been clear that a jury should consider potential and actual harm to third parties under section 9.1. Gilbert v. Security Finance Corp. of Oklahoma, Inc., 152 P.3d 165, 179 (Okla. 2006) ("If potential harm to other victims is a consideration, then actual harm to others is also an appropriate consideration."). This Court at the time of trial did not have the discretion to exclude evidence of harm to third parties, at least as it concerned plaintiffs' argument that Ford acted with reckless disregard, and the Court was required to submit to the jury an interrogatory on reckless disregard

---

[14]      There is the possibility that section 9.1 may be facially unconstitutional, but this issue has not been addressed by the Oklahoma Supreme Court or the Oklahoma Legislature.  The reckless disregard standard under Oklahoma law is based on harm to others, not just harm to the plaintiff.  Okla. Stat. tit. 23, § 9.1.  Further, although the statute itself provides for severability, severability may not be feasible where the very purpose of the statute is to punish for harm to others.  Under Philip Morris, Ford has a due process right to ensure that the jury uses punitive damages to punish it for harm suffered by plaintiff only, not all third parties that may have been injured in a rollover accident.  The Court would consider a limiting instruction based on Philip Morris, but there is a strong possibility that this would be contrary to the legislative intent and may void any award of punitive damages under section 9.1.  While the constitutionality of section 9.1 is ripe for judicial or legislative review, that issue is not before the Court at this time and the Court will not issue an advisory opinion on the constitutionality of the statute.

if the evidence presented at trial supported plaintiffs' claim for punitive damages.  <u>Hightower v. Kansas City Southern Ry. Co.</u>, 70 P.3d 835, 850 n.28 (Okla. 2003).

In the first trial, many of the statements of plaintiffs' counsel closely mirror objectionable statements made by the plaintiff's attorney in <u>Philip Morris</u>.  For example, the attorney in <u>Philip Morris</u> told the jury to

> think about how many other Jesse Williams in the last 40 years in the State of Oregon there have been . . . .  In Oregon, how many people do we see outside, driving home . . .  smoking cigarettes? . . .  Cigarettes . . . are going to kill ten [of every hundred.] [And] the market share of Marlboros [*i.e.*, Philip Morris] is one-third.

<u>Philip Morris</u>, 127 S. Ct. at 1061.  Here, plaintiffs' counsel repeatedly stated the number of deaths caused by rollovers nationwide, but never even attempted to limit that number to deaths allegedly caused by the Ford Explorer.  Plaintiffs' counsel tied the number of deaths in rollover accidents per year to the total deaths in the Iraq war in his closing statement:

> And she says, you know, we got 98 percent rollovers.  Some roll over on just their side.  And we got 2 percent.  How about 24,000 people seriously injured?  Ten thousand killed a year?  We are all fed up with Iraq.  But in three years since 2003, 2400 U.S. soldiers have died.  But here we've got 10,000 killed by roofs, and that's okay for her and Ford.  I don't think so.

Dkt. # 315, at 1689.  Ford rightfully refers to this statement as a "veritable supernova of prejudice." Dkt. # 290, at 7.  The jury was invited to consider the harm caused by rollovers in all types of vehicles, not just the Ford Explorer, and plaintiffs' counsel enhanced the prejudice to Ford by suggesting that Ford Explorers kill more people than the Iraq war.  In this Opinion and Order, the Court has noted many other statements by plaintiffs' counsel and plaintiffs' expert, Forrest, concerning harm to third parties.  <u>See</u> Dkt. # 309, at 171 ("this accident has happened literally thousands -- more than thousands of -- on other occasions with the Ford Explorer"); Dkt. # 311, at 715-16 ("The roof failures were all in the places that you see them over and over again in other

44

Explorer cases . . . ."); Dkt. # 315, at 163 ("when Ford Explorers roll, the roofs collapse.  273,000 rollovers in America, 24,000 serious injuries, 10,000 deaths").

The Supreme Court noted that there is a constitutionally permissible use of evidence of harm to others, but that the jury must be given proper instructions to ensure that a defendant's due process rights are not violated.  The Supreme Court stated:

> Evidence of actual harm to nonparties can help to show that the conduct that harmed the plaintiff also posed a substantial risk of harm to the general public, and so was particularly reprehensible-although counsel may argue in a particular case that conduct resulting in no harm to others nonetheless posed a grave risk to the public, or the converse.  Yet for the reasons given above, a jury may not go further than this and use a punitive damages verdict to punish a defendant directly on account of harms it is alleged to have visited on nonparties.

Philip Morris, 127 S. Ct. at 1064.  A plaintiff can introduce evidence that a defendant caused harm to third parties, but the jury must be instructed that this evidence has no bearing on the amount of punitive damages.  The Supreme Court was clear that the risk of juror confusion is so great that evidence of harm to the public must not be admitted without a limiting instruction and the erroneous admission of this evidence requires a new trial:

> [I]t is particularly important that States avoid procedure that unnecessarily deprives juries of proper legal guidance.  We therefore conclude that the Due Process Clause requires States to provide assurance that juries are not asking the wrong question, *i.e.*, seeking not simply to determine reprehensibility, but also to punish for harm caused [to] strangers.
>
> .     .     .
>
> We did not previously hold explicitly that a jury may not punish for the harm caused others.  But we do so now. . . . At the same time we recognize that conduct that risks harm to many is likely more reprehensible than conduct that risks harm to only a few.  And a jury consequently may take this fact into account when determining reprehensibility.
>
> .     .     .

45

> . . . state courts cannot authorize procedures that create an unreasonable and
> unnecessary risk of any such confusion occurring.  In particular, we believe that
> where the risk of that misunderstanding is a significant one-because, for instance, of
> the sort of evidence that was introduced to the jury-a court, upon request, must
> protect against that risk.  Although the States have some flexibility to determine what
> *kind* of procedures they will implement, federal constitutional law obligates them to
> provide *some* form of protection in appropriate cases.

Philip Morris, 127 S. Ct. at 1064-65 (emphasis in original).  As discussed above, the current framework for punitive damages in Oklahoma does not allow this Court to give an instruction limiting the jury's consideration of harm to the public, because harm to others is an integral part in any award of punitive damages under Okla. Stat. tit. 23, § 9.1.[15]

Even if the Oklahoma punitive damages statute permits evidence of harm to others, the Due Process Clause of the Fourteenth Amendment limits how this evidence may be used.  The Supreme Court has noted that evidence of harm to others might be admissible to prove reprehensibility, but states must craft procedures to ensure that jurors do not consider harm to third parties as a factor when determining the amount of punitive damages.  Any future presentation regarding punitive damages must comply with the due process limitations stated in Philip Morris, as the Court will be cognizant of the constitutional limitations on awards of punitive damages under state law.

---

[15]     In Philip Morris, Justice Ginsburg wondered what a jury instruction describing the permissible use of this evidence would look like, and stated that the "answer slips from [her] grasp."  Philip Morris, 127 S. Ct. at 1069 (Ginsburg, J., dissenting).

46

**IT IS THEREFORE ORDERED** that Defendant Ford Motor Company's Renewed Motion for Judgment as a Matter of Law, and Brief in Support (Dkt. # 289) is **denied**.   Defendant Ford Motor Company's Motion for New Trial, and Brief in Support (Dkt. # 290) is **granted**.

**IT IS FURTHER ORDERED** that the Judgment (Dkt. # 280) and the award of costs (Dkt. # 305) are **vacated**, and a new trial is set for **July 16, 2007 at 9:30 a.m.**

**DATED** this 20th day of March, 2007.

_____
CLAIRE V. EAGAN, CHIEF JUDGE
UNITED STATES DISTRICT COURT

47